UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| KEITH RATNAWEERA , | Case No. 2:11-cv-01908-MMD-CWH |
| Plaintiff, | ORDER |
| v. | (Defendant's Motion for Judgment – dkt. no. 15; |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, *as Claims Administrator on behalf of FOUR SEASONS HOTELS EMPLOYEE BENEFITS PLAN*, | Plaintiff's Motion for Judgment on the Pleadings and Administrative Record – dkt. no. 16) |
| Defendant. | |

## I.   SUMMARY

Before the Court are Defendant Life Insurance Company of North America's ("LINA") Motion for Judgment (dkt. no. 15) and Plaintiff Keith Ratnaweera's Motion for Judgment on the Pleadings and Administrative Record (dkt. no. 16).

## II.   FINDINGS OF FACT[1]

This case involves Plaintiff Keith Ratnaweera's alleged entitlement to long-term disability ("LTD") benefits under a group insurance policy issued by LINA to Plaintiff's former employer ("the Policy"), and which was part of an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

Ratnaweera was an income auditor for Four Seasons Hotel in Las Vegas, Nevada. On May 12, 2010, he stopped working due to injuries he sustained in an

---

[1]All cited facts appear without dispute in the administrative record.

automobile accident occurring the same day. The car accident occurred two months after a fall at work that damaged Ratnaweera's back, right foot, and cervical area. Ratnaweera was treating these injuries at the time of the car accident. Ratnaweera alleges that his primary disabling symptoms were neck pain and memory loss.

Ratnaweera was a participant in the Four Seasons Hotel Employee Benefits Plan/VEBA, Inc., group policy number LK-960635, by virtue of his employment with Four Seasons Hotel/VEBA ("subject plan"). Plaintiff alleges that under subject plan, he would have started receiving LTD benefits on November 8, 2010, after the exhaustion of the 180-day Elimination Period and based on a date of disability of May 12, 2010.

### A.     The Policy

The Policy states:

> The Insurance Company will pay disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy. He or she must provide the Insurance Company at his or her own expense, satisfactory proof of Disability before benefits will be paid.

The Policy contains an Elimination Period of 180 days. The Elimination Period is the period of time an employee must be continuously disabled before disability benefits are payable. Moreover, the Policy's definition of disability/disabled applicable during the Elimination Period states that "the Employee is considered Disabled if, solely because of Injury or Sickness, he or she is (1) unable to perform the material duties of his or her Regular Occupation; and (2) unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation."

Further, the Policy defines "Regular Occupation" as:

> The occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location.

///

///

### B.    Medical History

Ratnaweera saw several medical professionals for treatment after his accident. Much of his treatment was reviewed by LINA in making its determination that Ratnaweera was not entitled to LTD benefits. The Court summarizes Ratnaweera's relevant medical history below.

#### 1.    Dr. Smith

Ratnaweera saw Dr. Cade Smith, a chiropractor, between May 12, 2010, and October of 2010. Dr. Smith's written Initial Evaluation, dated May 12, 2010, noted Ratnaweera's symptoms included neck pain, headache, and mid-back pain. Dr. Smith stated that Ratnaweera would be unable to work from May 12, 2010, to July 2, 2010. On June 25, 2010, Dr. Smith recommended that Ratnaweera avoid over exertion in the form of pushing, pulling, lifting, stooping, reaching, and bending, as well as prolonged standing, walking, and sitting. Dr. Smith stated that Ratnaweera had stabilized by October 1, 2010.

Dr. Smith prepared a written Final Evaluation dated October 11, 2010. Dr. Smith noted that Plaintiff had been experiencing some short-term memory loss and anxiety/depression since the car accident. He stated that Ratnaweera had reduced range of motion in the cervical spine. He also noted that Ratnaweera's range of motion in the thoracic spine was within normal limits, as were the results of Plaintiff's neurological exam. Dr. Smith concluded that Ratnaweera had a partial cervical impairment rating of 8%, for a total rating of 8% to the body as a whole. Dr. Smith categorized Ratnaweera's cervical impairment as "minor." Finally, Dr. Smith informed LINA that Ratnaweera could return to work on a full-time basis as of December 1, 2010. This post-dates the Elimination Period.

#### 2.    Dr. Fathie

LINA requested and received medical records relating to Ratnaweera from Dr. Arezo Maria Fathie. Fathie specialized in internal medicine and is Ratnaweera's primary care physician. Dr. Fathie's records reveal the following:

- March 25, 2010: Ratnaweera had right foot tenderness and pain, stiffness in the neck and lumbar region, cervical pain, lumbar pain, and abdominal pain.

- April 22, 2010: Ratnaweera had pain in his foot, back, and neck. He also suffered from insomnia.

- May 27, 2010: Dr. Fathie notes Ratnaweera's car accident, and notes that he had memory loss and a blackout at the time of the accident. He experienced lumbar pain after the accident. Ratnaweera also had cervical spasticity/spasm. His neck range of motion was impaired and he reported memory loss.

- June 24, 2010: Ratnaweera had back pain, joint pain, right foot pain, neck pain, edema, and leg cramps. He also had short term memory loss, headaches, and insomnia.

- July 29, 2010: Ratnaweera had right foot pain, neck pain, headaches, and back pain.

- October 2010: right foot pain, lower back pain, cervical pain. Depression, anxiety, and memory loss.

- November 2, 2010: depression, memory loss, back and neck pain, a stiff neck, joint pain, right foot edema and pain, numbness and tingling. Dr. Fathie diagnosed reflex sympathetic dystrophy.

- December 8, 2010: no headaches or confusion reported. Lower back pain, leg cramps, depression, anxiety, and memory loss reported. Dr. Fathie recommended that Ratnaweera see an orthopedist for his ankle pain and noted that he needed physical therapy.

- February 3, 2011: Ratnaweera informs Dr. Fathie that he was going to speech therapy and "counseling to exercise the brain."

Dr. Fathie also informed LINA that Ratnaweera was unable to perform his regular occupation in June 2011. This information was made available to LINA after the Elimination Period expired, and LINA states that it should not be considered.

### 3. Dr. Siegler

Ratnaweera was first seen by Dr. John Siegler, a spine and pain management specialist, on June 23, 2010. Ratnaweera received numerous trigger point injections from Dr. Siegler between June 2010 and January 2011. Dr. Siegler's records reveal the following:

- June 23, 2010: Dr. Siegler reviewed an MRI and noted a large disc protrusion at C5-6. Dr. Siegler also noted that Plaintiff had no radicular symptoms.

4

- June 2010 neurological exam: Dr. Siegler determined that Ratnaweera was normal, finding 5/5 strength in the upper extremities, intact sensation, and normal tone.

- October 28, 2010: Dr. Siegler noted tenderness in the cervical spine and improved range of motion. The neurological exam was normal. The impressions were cervical disc protrusion, cervical discogenic pain, postconcussive symptoms, and cervicogenic headache.

- November 18, 2010: impressions of traumatic brain injury, cervical disc protrusion, cervical discogenic pain, postconcussive syndrome, and cervicogenic headache.

- January 3, 2011: Ratnaweera's cervical symptoms were stable but he was developing secondary myofascial tension. It was also noted that Ratnaweera had started speech therapy for cognitive issues. On exam, Plaintiff had tenderness in the cervical spine and limited range of motion. Dr. Siegler recommended a psychology follow-up, trigger point injections, and continued speech therapy.

- July 21, 2011: Ratnaweera reported to Dr. Siegler that the symptoms in his neck had improved and that his primary difficulty was continued memory difficulties. Ratnaweera wanted to pursue continued speech therapy and psychological treatment.

Dr. Siegler also reported that Ratnaweera's physical limitations included reaching, not lifting/carrying more than 20 pounds, and not pushing/pulling more than 50 pounds. His November 30, 2010 Physician's Statement stated that Ratnaweera's only physical limitation was reaching, which Plaintiff could do for 2.5 hours in an 8-hour work day.

### 4. Dr. Rimoldi

The medical records provided to LINA included a Physician Progress Report from orthopedist Reynold Rimoldi, who examined Ratnaweera. According to Dr. Rimoldi, Ratnaweera could work full duty without restrictions on October 13, 2010.

### 5. Diagnostic Tests

X-rays of Ratnaweera's right toes and right foot were taken in March of 2010 and were normal. X-rays of his lumbar spine taken on March 4, 2010, resulted in the impression of scoliosis, muscle spasm, and mild spondylosis.

An MRI of Ratnaweera's brain conducted on June 2, 2010, was normal. An MRI of the cervical spine on the same date contained the following impressions: multilevel degenerative disk disease and degenerative spondylosis at C3-4, C4-5, C5-6, and C6-7

levels with posterior disk bulge at spur at these levels, foraminal narrowing on the left due to posterior osteophyte formation at C3-4 through C6-7, and abnormal curvature.

A lumbar MRI on September 29, 2010, contained the following impressions: multilevel lumbar degenerative disc disease without spinal canal stenosis; moderate left-sided L4-5 neural foraminal stenosis; and mild bilateral L5-S1 neural foraminal stenosis.

A November 30, 2010 MRI of the right foot resulted in "mild" findings.

A neurologist performed testing of Ratnaweera on April 5, 2011, and the impression was right medical and lateral plantar neuropathy and no lumbar radiculopathy.

### 6.  Dr. Ross

Dr. Siegler referred Ratnaweera to Dr. Staci Ross, a clinical neuropsychologist, for a neuropsychological evaluation in October 2010. Dr. Ross prepared a written report dated November 8, 2010. Ratnaweera reported memory difficulties, word finding problems, comprehension problems, and difficulties with attention and concentration. Dr. Ross reported that the test results showed that Ratnaweera's "intellectual functioning" was moderately impaired:

> Overall, the results of the Neuropsychological Evaluation appear most consistent with mild to moderate impairments consistent [with] executive functioning and memory abilities which are likely impacted by a combination of factors including recent history of mild traumatic brain injury, further magnified by substantial mood decline and increased pain experience. At this point, given these combination of factors, [Ratnaweera's] ability to return to work in the capacity that he is used to, does not seem likely and further pursuing alternative forms of income are recommended.

The report also stated that Ratnaweera's reading abilities and written arithmetic abilities were intact, as were his overall memory for auditory information and memory for visual spatial information, and his overall receptive language skills and visual spatial skills. Ratnaweera's executive functioning was generally intact. The psychological testing showed that Ratnaweera had a "heightened degree of symptom endorsement," which suggested "a magnification of his symptoms and distress." Dr. Ross also noted that it was likely Ratnaweera was experiencing severe symptoms of depression.

Overall, Dr. Ross concluded that the test results were most consistent with mild to moderate impairments. Dr. Ross's diagnostic impressions were posttraumatic stress disorder, major depression, pain disorder, and mild cognitive disorder. She recommended that Ratnaweera begin psychotherapy for his anxiety and depression. She did not believe that Ratnaweera had the ability to return to work in his former capacity.

### 7.   Dr. Rosenthal

Prior to denying Plaintiff's claim, Dr. Rosenthal, a psychiatrist, reviewed Dr. Ross's neuropsychological evaluation for LINA. Dr. Rosenthal questioned the validity of Dr. Ross's test results and her interpretation of those results. Dr. Rosenthal determined that Ratnaweera's medical information did not support a cognitive impairment that would preclude him from working at his regular occupation.

### 8.   Plaintiff's Subjective Complaints

Finally, the Court considered Ratnaweera's subjective evidence of his disability to the extent it was corroborated by evidence of medically documented impairments showing that he has functional limitations or restrictions that render him disabled from working. *See, e.g.*, *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322-23 (7th Cir. 2007).

## C.   The Social Security Award

On or about March 29, 2011, Ratnaweera was awarded Social Security disability benefits based on a disability date of March 12, 2010. As reported to the Social Security Administration ("SSA"), Ratnaweera was limited in the ability to work due to a neck injury and issues with short term memory loss. He also suffered from depression and anxiety.

## D.   Plaintiff's Job Requirements

Four Seasons Resource Manager provided a LINA LTD Claims Manager with two job descriptions for Ratnaweera's regular occupation of "income auditor." This included material duties consisting of:

- Monitoring and ensuring correct classification of all revenue;

///

- Preparing and inputting month-end documents for general ledge processing;
- Reviewing various miscellaneous revenue areas;
- Accurately reconciling specific general ledger accounts as assigned by the Controller or Assistant Controller;
- Establishing and maintaining communication with the Night Audit and reviewing Night Audit work daily for accuracy;
- Investigating any discrepancies or problems that may occur with any of the daily work.

The job description also noted under physical demands that "head and neck" rotation was required for "prolonged periods of time." However, Defendant notes that under the Policy, LINA was to consider "the duties of the occupation as it is normally performed in the general labor market in the national economy," and not "work tasks that are performed for a specific employer or at a specific location."

The parties agree that Income Auditor is defined as a "sedentary occupation." A sedentary occupation requires lifting, carrying, pushing and pulling 10 pounds occasionally. It also involves mostly sitting, but may involve standing or walking for brief periods of time. 20 C.F.R. 404.1567(a) (defining "sedentary work" under the DOT). According to the specific job description obtained by LINA from Four Seasons, Ratnaweera must sit 6-7 hours per day, walk 1-2 hours per day, climb stair 4 times per day, occasionally squat or kneel, and rotate his head and neck for prolonged periods of time. He was also required to occasionally lift 40-pound boxes.

The Dictionary of Occupational Titles ("DOT") Occupation Description states that an Auditor's duties consist of the following:

- Reviews data regarding material assets, net worth, capital stock, surplus, income, and expenditures;
- Inspects items in books of original entry to determine if accepted accounting procedure was followed in recording transactions;
- Counts case on hand, inspects notes receivable and payable, negotiable securities, and cancelled checks;

///

- Verifies journal and ledger entries of cash and check payments, purchases, expenses, and trial balances by examining and authenticating inventory items;

- Prepares reports for management concerning scope of audit, financial conditions found, and source and application of funds.

The tasks may also include:

- May make recommendations regarding improving operations and financial position of company;

- May supervise and coordinate activities of auditors specializing in specific operations of establishments undergoing audits.

Undefined related tasks include:

- May audit banks and financial institutions and be designated Bank Examiner;

- May examine company payroll and personnel records to determine worker's compensation coverage and be designated Payroll Auditor.

Moreover, the DOT Occupational Requirements state that the occupation requires reasoning grades 13-14; mathematics grades 13-14; and language grades 13-14.

The physical requirements of the occupation under the DOT's definition are: lifting, pushing, pulling 10 pounds occasionally, and mostly sitting, and standing or walking for brief periods of time. It also "frequently" requires: reaching, handling, fingering, talking, hearing, and using one's near acuity senses.

### E. LINA's Handling of the Claim

LINA received Ratnaweera's claim for LTD benefits on November 11, 2010. LINA obtained information about Ratnaweera's medical conditions from Drs. Fathie, Ross, Siegler and Smith. Ratnaweera also filled out a Disability Questionnaire which stated that he could not work due to "neck pain and short term memory." After reviewing Plaintiff's medical records and test results, LINA concluded that the medical information did not support restrictions that would impair Plaintiff's ability to function as an income auditor. LINA denied the subject claim under their own occupation definition. The denial letter explained that LINA classified Ratnaweera's regular occupation as "sedentary,"

///

9

and applied the requirements of a sedentary occupation and of an auditor, as set forth in the DOT, to its analysis of whether Ratnaweera was disabled.

LINA's denial letter explained that its nurse case manager, Marcy Chadwick, R.N., reviewed the medical records obtained from Ratnaweera's providers. Nurse Chadwick determined that no reasonable exam findings supported a loss in Ratnaweera's ability to function in a sedentary occupation.

### F. Plaintiff's Administrative Appeal

Ratnaweera subsequently appealed LINA's denial of his LTD claim, as provided for in the Policy. He argued that LINA had failed to follow its own definition of disability in deciding the claim; ignored or disregarded credible medical evidence from his medical providers and his own reports of symptoms which prevented him from performing his regular occupation; and noted that the denial letter failed to consider his award of Social Security Disability Benefits ("SSDB") and relevant evidence in its analysis. The appeal letter also included additional documentation for LINA's consideration, including a letter from Dr. Smith, clarifying and explaining his mark on the "physician's statement of disability," which had indicated that Ratnaweera could return to full-time work. The letter stated "my statement that Keith can return to full-time work is misleading if read to mean that I believe he can work full-time." (LINA-RAT 0028.) Dr. Smith also stated that:

> My comments are limited to the chiropractic care I provided to [Ratnaweera's] head and neck. Of course, I did not treat [Ratnaweera's] cognitive issues. From a cognitive standpoint alone, however, I would not be surprised that Keith's work ability as a income auditor would be impaired on that basis alone, since I recognized problems and referred him to a neuropsychologist.

(*Id.*) The letter, however, also stated that Dr. Smith does not "tell [his] patients they cannot work." (*Id.*) Ratnaweera's appeal letter emphasized that LINA had failed to consider the cognitive demands required of his occupation as an Income Auditor, focusing solely on physical demands of the job.

Dr. Fathie also provided information for Ratnaweera's appeal. In a June 28, 2011, fax she informed LINA that she had seen Ratnaweera on February 3 and June 28,

2011, and that he was unable to work for "multiple reasons," but did not list any specific restrictions or limitations. Her opinion was based on Ratnaweera's mental decline, right foot neuropathy with intractable pain, and neck pain and restriction of range of motion.

In its review of Ratnaweera's appeal, LINA retained two doctors to review documents. They were Dr. Joseph Ricker, Ph.D., whose specialty is psychology/clinical neuropsychology, and Dr. Frank Polanco, M.D., whose specialty is occupational medicine. Drs. Ricker and Polanco generated written reports to LINA based on their document review and phone conversations with Drs. Ross and Siegler. LINA interpreted the reports generated by Drs. Ricker and Polanco as evidence supporting its original decision that Ratnaweera was not disabled as defined under the subject policy and based on LINA's characterization of Ratnaweera's occupation as a sedentary occupation.

### G. Procedural History

Plaintiff filed a Complaint in this Court on November 29, 2011, alleging wrongful denial of benefits under ERISA, and seeking LTD benefits due under the policy. Plaintiff brings his claim under 29 USC § 1132, which allows a participant or a beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan . . .". 29 U.S.C. § 1132(a)(1)(B). Plaintiff also seeks an award of attorney's fees under ERISA. The parties subsequently filed cross-motions for judgment under Fed. R. Civ. P. 52. (Dkt. nos. 15 and 16.)

Defendant argues that Ratnaweera was not disabled under the terms of the subject policy throughout the requisite Elimination Period, and therefore he is not entitled to LTD benefits.

### III. LEGAL STANDARD

The parties agree that the standard of review is *de novo*. Therefore, the Court's function is to "evaluate whether the plan administrator correctly or incorrectly denied benefits[.]" *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

///

Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." In a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the Court does not determine whether there is an issue of material fact, but whether the plaintiff is disabled under the policy. *See Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc). The Court is to "evaluate the persuasiveness of conflicting testimony," and make findings of fact. *Id.* This is considered a "bench trial on the record," which may "consist[ ] of no more than the trial judge rereading [the administrative record]." *Id.*

Under this standard, LINA's evaluation of the evidence is not accorded any deference or presumption of correctness. *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002); *accord Locher v. UNUM Life Ins. Co. of Am.*, 389 F.3d 288, 296 (2d Cir. 2004). Plaintiff bears the burden of proving his eligibility under the terms of the Policy by a preponderance of the evidence. *Sabatino v. Liberty Life Assurance of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003).

The operative issue before the Court is whether Ratnaweera has met his burden of establishing by a preponderance of the evidence that he is disabled within the meaning of the insurance policy's "own occupation" disability provision during the operative time period, the 180-day Elimination Period. Ratnaweera must establish that his disability was so severe as to "render him unable to perform the material duties of his job." *Wiley v. Cendant Corp. Short Term Disability Plan*, No. C 09-00423 CRB, 2010 WL 309670, at *8 (Jan. 19, 2010).

**IV. CONCLUSIONS OF LAW**

Ratnaweera argues that (1) he could not perform the cognitive duties of an Income Auditor; (2) he could not rotate his neck as required; and (3) he could not sit for the requisite period of time. Ratnaweera also argues that the cumulative effect of his

back pain, right foot pain, neck pain, memory loss, and loss of concentration made him unable to perform his own occupation during the Elimination Period.

While the Court considers the medical evidence in its review of the administrative record, the Court notes that "[i]t is an individual's ability to function, not simply their diagnosis, that entitles him or her to disability benefits." *Holifield v. Unum Life Ins. Co. of Am.*, 640 F. Supp. 2d 1224, 1237 (C.D. Cal. 2009).

### A. Cognitive Abilities

Defendant admits that the administrative record supports Ratnaweera's reported short-term memory loss after the car accident. But Defendant asserts that Drs. Smith, Siegler, and Fathie's medical records merely "rubber-stamped" Ratnaweera's self-reported memory loss, because these doctors did not perform cognitive testing on Ratnaweera to verify his claims.

However, Dr. Ross, the neuropsychologist, stated that Ratnaweera was likely unable to return to work in his former capacity as of October 2010. Defendant argues that this was not sufficient to establish Ratnaweera's cognitive disability, because Dr. Ross did not render a definitive opinion stating that Ratnaweera could not return to work in his occupation; the results of Dr. Ross's cognitive testing were largely normal; Dr. Ross's ultimate diagnosis was only of a "mild" cognitive disorder; Ratnaweera's reading and written arithmetic abilities were intact; Ratnaweera's overall memory for auditory and visual spatial information was generally intact; Ratnaweera's receptive language skills were generally intact; and his executive functioning was generally intact. Further, Defendant asserts that though Ratnaweera's expressive language skills were impacted by word finding, Dr. Ross noted that this was likely due to Ratnaweera's bilingualism. Finally, Defendant points out that Dr. Ross reported that Ratnaweera had a "heightened degree of symptom endorsement," which suggested "a magnification of his symptoms and distress."

///

///

Defendant also notes that Ratnaweera provided no evidence of psychological treatment, undermining his self-reported claims of memory loss and purported functional impairments.

In addition to Dr. Ross's Report, Dr. Fathie reported that on several of his visits to her during the Elimination Period, Ratnaweera was experiencing short-term memory loss.

Taken together, Drs. Ross and Fathie provided LINA with significant evidence that Ratnaweera had mild to moderate cognitive impairment throughout the Elimination Period. Although LINA's professionals found problems with some of Drs. Ross and Fathie's conclusions, the Court determines that Ratnaweera's continued short-term memory loss, even if mild to moderate, significantly impaired his ability to perform his duties as an income auditor. This conclusion is discussed in greater detail below, in Part (IV)(D).

### B. Neck Rotation

Dr. Smith reported that Ratnaweera experienced neck pain, but also stated that Ratnaweera's condition had stabilized by October 1, 2010. Dr. Smith's Final Evaluation, dated October 11, 2010, characterized Plaintiff's cervical impairment as "minor." The Evaluation also stated that Ratnaweera had reduced range of motion in the cervical spine. However, the evidence demonstrates that Dr. Smith recommended Ratnaweera could return to work *after* the completion of the Elimination Period. This evidence supports Ratnaweera's contention that he was unable to work during the entire Elimination Period. Further, Dr. Siegler's November 11, 2010, examination of Ratnaweera demonstrated impressions of traumatic brain injury, cervical disc protrusion, cervical discognegic pain, postconcussive syndrome, and cervicogenic headache.

Dr. Fathie also reported that Ratnaweera experienced impaired neck range of motion, neck pain, and back pain in Ratnaweera's visits to Dr. Fathie during the Elimination Period.

///

As discussed in greater detail below, in Part (IV)(D), the Court determines that this evidence of neck pain and impaired neck function significantly impacted Ratnaweera's ability to perform his own occupation.

### C. Sitting

In his Statement provided to LINA, Dr. Smith reported that Ratnaweera could only sit for 2.5 hours of the 8 hour workday. (LINA-RAT 0269.) The Regular Occupation definition lists an Income Auditor as sitting most of the day. Defendant argues that because Dr. Smith said Ratnaweera could perform his regular occupation as of December 1, 2010, any limitation as to sitting did not preclude Ratnaweera from performing his regular occupation. But this argument holds no weight because as stated, Dr. Smith stated that Ratnaweera could not return to work until December 1, 2010 – after the duration of the Elimination Period.

Dr. Rimoldi, the orthopedist, stated that Ratnaweera could return to work full duty, with no restrictions, on October 13, 2010. (LINA-RAT 0203.) On the form Dr. Rimoldi completed, he had the opportunity to mark whether Ratnaweera should be precluded from prolonged sitting, but did not check that box. (*Id.*) Moreover, Dr. Siegler's November 30, 2011, Statement did not report sitting limitations.

### D. Totality of Plaintiff's Symptoms

The Court considers the totality of Ratnaweera's disabilities in determining whether he could perform the material functions of his own occupation. *See Lawrence v. Motorola, Inc.*, No. 04-1552, 2006 LW 2460921, at *8 (D. Ariz. Aug. 24, 2006) (plan administrator must consider the entire combination of a plaintiff's impairments).

Defendant asserts that LINA correctly denied Ratnaweera LTD benefits based on the information provided by his treating physicians in support of his LTD claim:

- His neck was deemed stable as of October 1, 2010;
- Dr. Smith, the treating chiropractor, categorized Ratnaweera's cervical impairment as "minor;"
- Dr. Smith stated that Ratnaweera could work full-time at his regular occupation with certain physical limitations;

15

- Dr. Siegler reported to LINA that Ratnaweera's only physical limitations regarded reaching, not lifting/carrying more than 20 pounds and not pushing/pulling more than 50 pounds;

- Dr. Siegler's November 30, 2010, physician's statement stated that Ratnaweera's only limitation was physical limitation as to reaching, which he stated Ratnaweera could do for 2.5 hours in an 8-hour work day;

- In October 2010, during the Elimination Period, Dr. Rimoldi, an orthopedist, physically examined Ratnaweera and stated that Ratnaweera could return to work full duty, with no restrictions, as of October 13, 2010.

According to Defendant, this evidence demonstrates that Ratnaweera's treating physicians acknowledged that he was not totally disabled throughout the Elimination Period of May 12, 2010, to November 8, 2010. At the very least, Defendant states that this evidence establishes Ratnaweera could perform the job requirements with modification to accommodate his disability, as allowed by the job description. (LINA-RAT 0471.)

Taken together, certain evidence supports Defendant's denial of LTD benefits, but the preponderance of the evidence demonstrates that Ratnaweera was unable to perform the material duties of his own occupation during the Elimination Period.

First, Defendant's assertion regarding reaching is flawed. The DOT job description states that Ratnaweera will need to engage in "frequent reaching," and Dr. Siegler's conclusion that Ratnaweera could perform reaching in a limited capacity (2.5 hours per 8 hour workday), when combined with Ratnaweera's other physical limitations involving his neck pain, support the conclusion that Ratnaweera was disabled under the terms of the Policy.

Importantly, Ratnaweera's occupation required him to rotate his neck for prolonged periods of time, and the considerable evidence about his impaired neck and cervical movement supports Ratnaweera's contention that he was disabled during the Elimination Period. During that period, Dr. Smith stated that Ratnaweera had reduced range of motion and cervical impairment. Dr. Smith stated that Ratnaweera could return to work *after* the expiration of the Elimination Period, and noted Ratnaweera's

continuous reduced cervical range of motion. Dr. Siegler also reached this conclusion. (LINA-RAT 0545, stating that Dr. Siegler gave a 12/1/10 return to work date). Further, Dr. Smith clarified his position in his letter for Ratnaweera's appeal, stating that he did not believe Ratnaweera had the ability to work full time.

Moreover, the information provided to LINA from Dr. Fathie reveals that Ratnaweera had significant mental and physical impairments preventing him from working in his own occupation. Dr. Fathie reported that Ratnaweera suffered right foot pain, stiffness in the neck and lumbar region, and cervical, lumbar, and abdominal pain, and memory loss throughout the Elimination Period.[2]

Dr. Ross determined that Ratnaweera could not return to his job as an income auditor in his former capacity. Memory difficulties, word finding problems, comprehension problems, and difficulties with attention and concentration all clearly impair one's ability to function as an income auditor under the DOT definition. The profession requires strong cognitive abilities, including language and reasoning skills of grades 13-14. Dr. Ross's report stated that Ratnaweera's reading, written arithmetic abilities, overall memory for auditory information, and memory for visual spatial information abilities were intact. However, the Report also stated that Ratnaweera's "executive functioning and memory abilities which are likely impacted by a combination of factors including recent history of mild traumatic brain injury, further magnified by substantial mood decline and increased pain experience." While Defendant is correct that Ratnaweera did not have mental testing, the lack of objective mental testing does not require the Court to "totally discount the observation" of Ratnaweera's treating physicians, who noted the existence of various cognitive problems during their treatment of him. *See Perryman*, 690 F. Supp. 2d at 945.

///

---

[2] Because Dr. Fathie's assessment that Ratnaweera could not return to work was provided to LINA after the Elimination Period expired, the Court does not consider that information here.

17

The evidence provided by Drs. Ross, Fathie, and Smith must be weighed against Dr. Rimoldi's results.  Dr. Rimoldi examined Ratnaweera during the Elimination Period on October 13, 2010, and determined that Ratnaweera could return to work full duty with no restrictions as of that date. Dr. Rimoldi also reviewed Ratnaweera's lumbar MRI results from September 29, 2010.  However, the Court agrees with Ratnaweera that this evidence is not persuasive, because it lists an incorrect date of injury (March 2, 2010), and does not provide any details supporting the conclusion that Ratnaweera could return to work full duty, no restrictions, on October 3, 2010.

The Court determines that the medical opinions of Dr. Fathie, Ratnaweera's primary care physician, and Dr. Smith, who saw Ratnaweera several times during the Elimination Period, are more persuasive than Dr. Rimoldi's assessment.[3]  Notably, ERISA does not require the Court to accord special deference to the opinions of Ratnaweera's treating physicians.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). However, the Court may give significant weight to the opinions of Ratnaweera's treating physicians "to the extent that they merit it in light of such factors as the length and nature of the doctor-patient relationship, the level of the doctor's expertise, and the compatibility of the doctor's opinion with the other evidence." *Perryman v. Provident Life and Accident Ins. Co.*, 690 F. Supp. 2d 917 (D. Ariz. 2010) (*citing Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Protection Plan*, 349 F.3d 1098, 1109, n.8 (9th Cir. 2003) (other citations omitted)).

Moreover, contrary to Defendant's assertion, the fact that Ratnaweera was able to work despite reported chronic pain in his neck and documented limited cervical range of motion in March and April 2010 *does not* lend support for the argument that Ratnaweera could have performed his regular occupation with chronic neck pain and limited cervical range of motion because he had done so in the past. For, "[s]ome people manage to

---

[3]They are likewise more persuasive than Drs. Ricker and Polanco's assessments, as these physicians did not treat Ratnaweera, which need not be accorded special deference.  *See Hoover*, 290 F.3d at 809.

work [with a disability] for months, if not years, only as a result of superhuman effort, which cannot be sustained . . . . Reality eventually prevails, however, and limitations that have been present all along overtake even the most determined effort to keep working." *Wuollet v. Short-Term Disability Plan of RSKCo*, 360 F. Supp. 2d 994, 1009 (D. Minn. 2005).

Further, the SSA determination weighs in Ratnaweera's favor. In an ERISA disability case, "the SSA determination [of total disability], though certainly not binding, is far from meaningless." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005).

For the reasons listed above, the Court determines that the totality of Ratnaweera's disabilities demonstrates that he was disabled under the own occupation definition during the Elimination Period.

**V.    REMAINING ISSUES**

**A.    Limited Benefit Period**

LINA argues that Ratnaweera's disability was caused or contributed to by his depressive disorder and/or his anxiety disorder, and that because of this, the Policy limits the LTD benefits payable to Ratnaweera to a maximum period of 24 months. Plaintiff asserts that he has never had an opportunity to challenge this position, which LINA revealed for the first time in its Motion. The Court will hold a separate hearing regarding the time period for which Plaintiff may receive LTD benefits. The hearing will be scheduled in the coming weeks via minute order.

**B.    Attorneys' Fees**

Defendant summarily states that the relevant factors do not warrant an award of attorneys' fees to Plaintiff here. Ratnaweera requests that the Court allow him to file a separate and fully briefed motion for attorney's fees. The Court agrees with Plaintiff that separate briefing on the issue is required. The Court will issue a briefing schedule on this matter after it holds the hearing regarding the limited benefits period.

///

///

## VI.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of these Motions.

IT IS HEREBY ORDERED that Plaintiff's Motion for Judgment on the Pleadings (dkt. no. 16) is GRANTED to the extent herein described. Defendant's Motion (dkt. no. 15) is DENIED.

DATED THIS 29th day of March, 2013.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE